## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

RAYMOND KRAYNAK,

Defendant.

No. 4:17-CR-00403

(Judge Brann)

## MEMORANDUM OPINION

### AUGUST 10, 2021

Currently pending before the Court is a motion *in limine* filed by Raymond Kraynak in which he seeks to exclude any evidence related to: data from the Pennsylvania Prescription Drug Monitoring Program; information regarding prescription information from Anthem Blue Cross Blue Shield; pharmacy records; information from Health Integrity, LLC; and certain nicknames for controlled substances.[1] For the following reasons, the motion will be granted in part and denied in part.

## I.      BACKGROUND

In 2017, Kraynak was indicted on nineteen separate charges related to his conduct as a physician who was licensed to prescribe Schedule II, III, IV, and V controlled substances.[2] In Counts 1 through 12, Kraynak is charged with unlawfully distributing and dispensing a controlled substance to twelve different individuals, in

---

[1]   Docs. 119, 120, 138.
[2]   Doc. 3.

violation of the Controlled Substances Act, 21 U.S.C. § 841(a)(1) and (b)(1)(C).[3]
Counts 13 through 17 allege unlawful distributing and dispensing of a controlled
substance resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).[4]
Finally, Counts 18 and 19 allege that Kraynak maintained two drug-involved
premises, in violation of 21 U.S.C. § 856(a)(1).[5]

As alleged in the indictment, Kraynak is a Doctor of Osteopathy and, in that
capacity, he was previously disciplined by the Commonwealth of Pennsylvania
Department of State, Board of Osteopathic Medicine for allegedly failing to maintain
proper documentation to justify controlled substance prescriptions, and for failing to
take other appropriate actions with respect to those prescriptions.[6] The Government
alleges that, from May 2012 until January 2016, Kraynak prescribed 3,622,598
oxycodone pills, which accounted for 80.62% of the controlled substances that he

---

[3]   *Id.* at 15-17. The indictment alleges that Kraynak dispensed controlled substances as follows:
Count 1—hydrocodone to R.C. from December 21, 2012 to May 2, 2015; Count 2—oxycodone
to F.H. from December 21, 2012 to July 31, 2014; Count 3—oxycodone to D.H. from June
2013 to February 17, 2015; Count 4—oxycodone to A.K. from December 21, 2012 to October
24, 2013; Count 5—hydrocodone to M.L. from December 21, 2012 to October 15, 2014; Count
6—oxycodone to C.S. from December 21, 2012 to April 29, 2014; Count 7—oxycodone to
D.B. from January 2014 to October 5, 2014; Count 8—oxycodone to W.E. from December 21,
2012 to December 14, 2014; Count 9—oxycodone to F.G. from December 21, 2012 to
February 10, 2013; Count 10—oxycodone to T.M. from December 21, 2012 to April 28, 2014;
Count 11—fentanyl to J.S. from January 2013 to July 6, 2016; and Count 12—oxycodone to
R.W. from February 2013 to September 15, 2016.

[4]   *Id.* at 18-19. The indictment alleges that Kraynak distributed controlled substances causing
death as follows: Count 13—alprazolam, hydrocodone, and carisoprodol to R.C. on or about
May 2, 2015; Count 14—oxycodone to D.H. on or about February 17, 2015; Count 15—
oxycodone and alprazolam to A.K. on or about October 24, 2013; Count 16—temazepam,
alprazolam, and hydrocodone to M.L. on or about October 15, 2014; and Count 17—
oxycodone, carisoprodol, diazepam, and zolpidem to C.S. on or about April 29, 2014.

[5]   *Id.* at 20-21.

[6]   *Id.* at 1-3.

prescribed during that period and that, from January 1, 2016 until July 31, 2017, Kraynak "prescribed an aggregate of 2,792,490 dosage units of oxycodone, hydrocodone, OxyContin[,] and fentanyl to approximately 2,838 patients," which "made Kraynak the top prescriber for all of the Commonwealth of Pennsylvania for these controlled substance during this 19-month period of time."[7] These numbers allegedly resulted from Kraynak's practice of prescribing controlled substances outside of the usual course of professional practice and without a legitimate medical purpose.[8]

The Government further avers that Kraynak's medical records demonstrate that his patient files were frequently "incomplete or missing and . . . failed to contain the required information regarding symptoms observed and reported, diagnosis of condition, direction for use, changes in symptoms observed and reported in their diagnosis of the condition for which the controlled substance was being given and in the directions given to the patient."[9] As a result of these facts, the Government alleges that Kraynak did not issue prescriptions to certain individuals "for legitimate medical purposes and in the usual course of professional practice" but, instead, acted as a drug trafficker during those encounters.[10]

---

[7]  *Id.* at 7-8.
[8]  *Id.* at 13-15.
[9]  Doc. 126 at 3.
[10]  *Id.* at 2.

Kraynak has now filed a motion *in limine* to exclude evidence that the Government seeks to introduce at trial. Kraynak contends that this evidence is extrinsic to the crimes charged and is not otherwise admissible under Federal Rule of Evidence 404(b), as the evidence is offered only to demonstrate propensity.[11] The Government opposes Kraynak's motion on the grounds that the evidence is intrinsic to the charges and, in any event, is admissible under Rule 404(b).[12]

## II.    DISCUSSION

Motions *in limine* are threshold motions that courts will typically deny or defer ruling upon until the time of trial (outside of the presence of the jury), unless the evidence is clearly inadmissible. Such determinations are preliminary rulings that are "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer."[13] Although the Federal Rules of Evidence do not expressly acknowledge motions *in limine* or provide for their use, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials."[14]

### A.    Whether the Evidence is Intrinsic to the Charges

First, the parties dispute whether the challenged evidence is intrinsic or extrinsic to the charges. The United States Court of Appeals for the Third Circuit

---

[11]  Docs. 120, 138
[12]  Docs. 131, 140.
[13]  *Luce v. United States*, 469 U.S. 38, 41 (1984).
[14]  *Luce*, 469 U.S. at 41 n.4.

has explained that evidence is intrinsic to the charged crime under two circumstances. "First, evidence is intrinsic if it 'directly proves' the charged offense," which "gives effect to Rule 404(b)'s applicability only to evidence of '*other* crimes, wrongs, or acts'" because "[i]f uncharged misconduct directly proves the charged offense, it is not evidence of some 'other' crime."[15] "Second, uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."[16] As the Third Circuit has explained, "the nature and scope of the evidence able to be deemed intrinsic will vary with the charged offense."[17]

To prove that Kraynak committed the charged offenses, with respect to the distribution charges alleged in Counts 1 through 12, the Government must prove four things: (1) that Kraynak distributed a mixture or substance containing a controlled substance; (2) that he distributed the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose; (3) that he distributed the controlled substance while knowing or intending that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose; and (4) that the controlled substance was the substance identified in the indictment.[18]

---

[15]   *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010).

[16]   *Id.* at 249 (internal quotation marks omitted).

[17]   *United States v. Williams*, 974 F.3d 320, 357 (3d Cir. 2020).

[18]   Third Cir. Model Crim. Jury Instruction 6.21.841B; *United States v. Rottschaefer*, 178 F. App'x 145, 147 (3d Cir. 2006). *See also* 21 C.F.R. § 1306.04(a) (noting that "[a] prescription

As to Counts 13 through 17, alleging distribution of a controlled substance resulting in death, the elements are the same as those listed above, except that Counts 13 through 17 contain the additional element that death must have resulted from the use of those controlled substances.[19] Finally, with respect to Counts 18 and 19, the Government must prove that Kraynak "'(1) knowingly exercise[ed] some degree of control over the premises; (2) knowingly ma[de] the place available for the use alleged in the indictment; and (3) continuity in pursuing the manufacture, distribution, or use of controlled substances.'"[20] Based on these requirements, the Court concludes that, with one exception, the challenged evidence is intrinsic or otherwise admissible.

### i.     Administrative Actions

First, as to evidence of two prior administrative actions against Kraynak related to his prescription practices, that evidence is directly relevant to the charged offenses. In 2012, the Commonwealth of Pennsylvania, Bureau of Professional and

---

for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice . . . [and a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances")

[19]  *Burrage v. United States*, 571 U.S. 204, 210 (2014).

[20]  *United States v. Elmore*, 586 F. App'x 559, 561 (11th Cir. 2014) (quoting *United States v. Clavis,* 956 F.2d 1079, 1090 (11th Cir. 1992))). As is clear from the language of 21 C.F.R. § 1306.04(a), and as discussed with respect to the other charges against Kraynak, to have maintained the premises for the pursuit of the distribution of controlled substances, any prescriptions issued from those premises must have been outside the usual course of professional practice and not for a legitimate medical purpose.

Occupational Affairs entered into a consent agreement—following allegations that Kraynak's controlled substance prescription behavior was deficient in several respects—with Kraynak wherein he admitted no wrongdoing but agreed that he had failed to conform to the relevant medical practices regarding the issuance of prescriptions for controlled substances.[21] Kraynak further agreed to: undergo an intensive course on controlled substance management; issue controlled substance contracts for his patients; and engage a professional office management company to review his documentation practices.[22] Thereafter, administrative action was again taken against Kraynak for allegedly failing to conform to prevailing medical standards for prescribing controlled substances; the Commonwealth of Pennsylvania ultimately concluded that Kraynak failed to annotate relevant information into patient medical records, and Kraynak was ordered to complete six hours of remedial continuing medical education related to patient medical documentation.[23]

This evidence is intrinsic to the charges against Kraynak, as it demonstrates that Kraynak had specific knowledge of the medical standards that are applicable to patient records and prescription practices. As noted above, a key element of all charges against Kraynak is the requirement that his conduct in issuing prescriptions must have been outside the usual course of professional practice and not for a

---

[21] Doc. 136-1 at 8-9.
[22] *Id.*
[23] *Id.* at 9-11.

legitimate medical purpose.[24] As the Government's expert witness has previously explained, patient medical files are critical for the purposes of prescribing controlled substances because they "distinguish[] the practice of medicine from drug dealing. Absent medical documentation, . . . the dispensing of controlled substances in type and amounts requested by patients because patients report satisfaction with the drugs is no different than any other form of drug dealing."[25]

Evidence that demonstrates Kraynak knew of the documentation required in medical records when prescribing controlled substances and knowingly failed to comply with those requirements is thus direct evidence that Kraynak's conduct was outside the usual course of professional practice and not for a legitimate medical purpose. Because evidence of administrative actions taken against Kraynak "directly proves the charged offense, it is not evidence of some 'other' crime" and is admissible as intrinsic evidence that falls outside the bounds of Rule 404(b).[26]

## ii. Evidence from Pennsylvania Prescription Drug Monitoring Program

Next, Kraynak challenges the use of records collected by the Pennsylvania Prescription Drug Monitoring Program (PDMP) on the ground that PDMP reporting was not mandatory until January 1, 2017—after the events at issue in this case—

---

[24]  21 C.F.R. § 1306.04(a).
[25]  Doc. 60 at 5.
[26]  *Green*, 617 F.3d at 248-49.

and, thus, any data from the PDMP may not be entirely accurate or capture practice wide information.[27]

The PDMP is a database that "collects information on all filled prescriptions for controlled substances" issued within Pennsylvania.[28] The PDMP has long required that dispensers of controlled substances report all Schedule II substances dispensed within the state, but in 2014 a law was passed "which requires monitoring Schedule II through Schedule V controlled substances."[29] Finally, "[a]s of January 1, 2017, dispensers are required to collect and submit [relevant] information to the PDMP no later than the close of the subsequent business day."[30]

The Government asserts that investigators obtained PDMP data which demonstrates "that from May of 2012 until the end of January 2016, Kraynak prescribed 3,622,598 Oxycodone pills" and "from January 1, 2016 through July 31, 2017, Kraynak prescribed an aggregate of 2,792,490 dosage units of oxycodone, hydrocodone, OxyContin and fentanyl to approximately 2,838 patients," making "Kraynak the top prescriber for all of the Commonwealth of Pennsylvania for these controlled substances during that 19-month period."[31] This data also reveals that

---

[27] Doc. 138 at 3-4.

[28] Pennsylvania Department of Health, *Prescription Drug Monitoring Program (PDMP)*, https://www.health.pa.gov/topics/programs/PDMP/Pages/PDMP.aspx (last visited July 28, 2021).

[29] Pennsylvania Department of Health, *PDMP Questions & Answers (Q&A)*, https://www.health.pa.gov/topics/programs/PDMP/Pages/QA.aspx (last visited July 28, 2021).

[30] *Id.*

[31] Doc. 140 at 8.

some patients were issued multiple prescriptions on a single day, and sought early prescription refills.[32]

This evidence demonstrates that Kraynak prescribed significant quantities of controlled substances to his patients, which "directly proves the charged offense" and therefore constitutes intrinsic evidence,[33] as this evidence is relevant to the question of whether Kraynak issued prescriptions outside the usual course of professional practice and not for a legitimate medical purpose. As the United States Court of Appeals for the Ninth Circuit has emphasized, "uncharged prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose."[34]

In similar circumstances, the United States Court of Appeals for the Eleventh Circuit considered whether the district court erred in admitting "more than 33,000 prescriptions for controlled substances [relating to both charged and uncharged conduct] . . . and a chart summarizing these prescriptions" in the prosecution of a doctor for Medicaid fraud and dispensing controlled substances in violation of the Controlled Substances Act.[35] That court determined that the evidence of

---

[32] Doc. 136-1 at 21-22.
[33] *Green*, 617 F.3d at 248-49.
[34] *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1695 (2021).
[35] *United States v. Merrill*, 513 F.3d 1293, 1300 (11th Cir. 2008).

prescriptions "was relevant and that its probative value was not outweighed by its potential for prejudice."[36] The Court determined that the evidence that admissible because, as relevant here, "the Government could only prove [the prescription of] 'excessive and inappropriate quantities and combinations' [of controlled substances] by presenting evidence on the quantities and combinations themselves and then comparing those quantities and combinations to a relevant norm to show that they were excessive and inappropriate."[37]

Here, PDMP-derived evidence permits the jury to evaluate Kraynak's prescription practices as a whole and compare those prescriptions to other physicians within the state. This is important for the jury to evaluate whether the prescriptions issued by Kraynak were appropriate, or whether those prescriptions were excessive and therefore outside the usual course of professional practice and without a legitimate medical purpose.

Kraynak nevertheless argues that the PDMP evidence is not admissible because mandatory reporting requirements were not put into effect until January 1, 2017, after the time period at issue in this case, and therefore the PDMP data may be misleading and may fail to capture practice wide information.[38] The Court cannot conclude at this time—based on the available evidence—that PDMP data from the time frame at issue does not accurately capture practice wide prescription data.

---

[36]  *Id.* at 1301.
[37]  *Id.* at 1302.
[38]  Doc. 138 at 3-4.

Among other laws, the 2014 Achieving Better Care by Monitoring All Prescriptions Program Act required that "[a] dispenser or pharmacy *shall*, according to the format determined by the board, electronically submit information to the system regarding each controlled substance dispensed."[39] Prior to 2014, "[t]he PDMP [still] required the reporting of Schedule II controlled substances."[40] There is no available evidence that would permit the Court to conclude that PDMP data that was required to be submitted prior to 2017 is incomplete or inaccurate such that it fails to capture practice wide information. Because there is no information that undermines that accuracy of the PDMP data that the Government intends to present at trial, Kraynak's motion will be denied, although the Court may revisit this ruling upon appropriate motion from Kraynak should the evidence proffered at trial fail to demonstrate that PDMP data is accurate and reliable.

### iii.  Pharmacy Records

Next, Kraynak argues that pharmacy records should also be excluded because records which demonstrate that Kraynak was the largest provider of opioids in Pennsylvania are irrelevant given that he "was one of the few family practice doctors in that part of coal country at the time of this incident," and because a patient's

---

[39]  HEALTH AND SAFETY—PRESCRIPTION DRUG MONITORING PROGRAM, 2014 Pa. Legis. Serv. Act 2014-191 (S.B. 1180) (PURDON'S) (emphasis added).

[40]  Pennsylvania Department of Health, *PDMP Questions & Answers (Q&A)*, https://www.health.pa.gov/topics/programs/PDMP/Pages/QA.aspx (last visited July 28, 2021).

request for early prescription refills is irrelevant to Kraynak's conduct in issuing those prescriptions.[41]

The Government asserts that, at trial, it intends to introduce pharmacy records from local pharmacies that filled prescriptions issued by Kraynak between January 1, 2014 and November 11, 2015, including records "maintained by Walmart, RiteAid, CVS, Medicine Shoppe, Belski Community Pharmacy, and Burch's Pharmacy, among others."[42] The data obtained from those pharmacies reveals that, for several pharmacies, Kraynak was by far the top prescriber of Schedule II controlled substances. At Belski Community Pharmacy, 54% of Schedule II controlled substances were prescribed by Kraynak, with the second highest prescriber accounting for 11.5% of such prescriptions.[43] Similarly, at RiteAid Pharmacy #2478, Kraynak accounted for 42.7% of Schedule II prescriptions, while the second highest prescriber accounted for 3.5% of those prescriptions, at RiteAid Pharmacy #205, Kraynak accounted for 37.5% of Schedule II prescriptions, while the second highest prescriber accounted for 5.3% of such prescriptions, and at a CVS pharmacy, Kraynak accounted for 25% of Schedule II prescriptions, while the second highest prescriber of such substances accounted for 8.4% of prescriptions.[44] Law enforcement also discovered that Kraynak's patients frequently tried to obtain

---

[41] Doc. 138 at 4-6.
[42] Doc. 140 at 8-9.
[43] Doc. 136-1 at 20-21.
[44] *Id.*

early refills of Schedule II controlled substances, Kraynak often issued prescriptions days apart, and pharmacies regularly refused to fill prescriptions written by Kraynak.[45]

Records that permit a comparison of Kraynak's prescription habits to those of other doctors in the same region constitute intrinsic evidence. Were the jury to conclude that Kraynak issued prescriptions of Schedule II controlled substances in quantities that vastly outstripped any other physician in the region, it could reasonably infer "that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose."[46] Because that evidence "directly proves" an element of the charged offenses, it does not fall under Rule 404(b), and it is admissible.[47]

Kraynak nevertheless argues that such records are irrelevant, since there are few family medicine practitioners in the region where Kraynak practiced.[48] However, Kraynak ignores that the data comes directly from local pharmacies and therefore captures data on a local—not state—level. The data thus accounts for any decrease in the number of local practitioners. Were Kraynak's prescription numbers artificially inflated due to the absence of other doctors in the region, one would expect to find that the second most active prescriber of Schedule II controlled

---

[45]   *Id.* at 20.
[46]   *Lague*, 971 F.3d at 1040.
[47]   *Green*, 617 F.3d at 248-49.
[48]   Doc. 138 at 5.

substances in the region would likewise account for a large percentage of each pharmacy's prescriptions, but the data shows the opposite. Thus, the data remains relevant and admissible.

Finally, the Court cannot at this time agree with Kraynak's assertion that evidence which reveals that his patients routinely sought early prescription refills is irrelevant. Admittedly, the relevance of such evidence is not immediately clear. However, it could be, for example, that evidence that individuals frequently seek early refills of their opioid prescriptions is a sign of drug abuse that should indicate to a physician that he should cease issuing prescriptions to that patient. If Kraynak were to have ignored such signs of abuse, it could indicate that the prescriptions he issued were outside the usual course of professional practice and without a legitimate medical purpose. Accordingly, the Court will deny Kraynak's motion with respect to any mention of early prescription refills, without prejudice to his right to reassert this motion when a more complete picture of the evidence is available to the Court.

### iv.    Referrals from Medical Insurers

Next, Kraynak contends that evidence related to an investigation conducted by Anthem Blue Cross Blue Shield ("Anthem") should be excluded because that investigation covers only information within Anthem's network, and thus may be prejudicial and misleading. He further asserts that information from Health Integrity, LLC ("Health Integrity") should be excluded because its algorithm—designed to

spot potential Medicare fraud—constitutes expert opinion and is highly prejudicial, as the jury may "believe that a computer has already done its work for them."[49]

With respect to the evidence compiled by Anthem during its investigation into Kraynak's prescription patterns, that investigation revealed that, between January 2012 and November 2014, Kraynak prescribed 54,820 medications, with 39% of those prescriptions issued for controlled substances.[50] Furthermore, Kraynak prescribed dangerous combinations of controlled substances, and prescribed far greater quantities of controlled substances than did other family medicine physicians both within Pennsylvania and nationally—his rate of prescription for controlled substances was more than four and one-half times the rate of other physicians within Pennsylvania, and well over three times the rate of other physicians nationally.[51] Moreover, several controlled substances were in the top ten prescriptions issued by Kraynak, while none were in the top ten prescriptions issued by other family medicine practitioners in Pennsylvania.[52]

This evidence is intrinsic to the charges as, again, it tends to demonstrate that Kraynak issued "prescriptions of controlled substances in enormous quantities, and in dangerous combinations" and issued prescriptions in levels far beyond other family practitioners, which "support[s] a reasonable inference that the underlying

---

[49]  Doc. 138 at 8; *see id.* at 6-9.
[50]  Doc. 136-3 at 1.
[51]  *Id.*
[52]  *Id.*

prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose."[53] Because this directly proves an element of the offenses charged, it too falls outside the ambit of Rule 404(b) and is admissible.

Kraynak asserts that the evidence is nonetheless inadmissible because it presents only a small portion of the prescriptions that were issued in Pennsylvania, and therefore may be incomplete and may have the tendency to mislead the jury.[54] First, there is no indication in the record that this evidence is actually incomplete or misleading, as Anthem's data generally comports with PDMP data that shows Kraynak was a top prescriber of controlled substances. Second, any prejudice that could result from the presentation of this evidence may be mitigated through appropriate jury instructions and vigorous cross-examination by defense counsel.

As to evidence of a referral from Health Integrity to the Drug Enforcement Agency, Health Integrity—a Medicare Drug Integrity Contractor—was contracted to attempt to detect fraud, waste, and abuse in the Medicare Part D program.[55] Using its "Pill Mill Doctors Proactive Analysis Model," Health Integrity assigned Kraynak a predicted risk score of 977 on a scale of 1-1000 for overprescribing controlled substances.[56]

---

[53] *Lague*, 971 F.3d at 1040.
[54] Doc. 138 at 6-7.
[55] Doc. 131 at 12.
[56] *Id.*

Based on the available evidence, the Court is unable to conclude that this evidence is intrinsic to the charges levied against Kraynak, or that the evidence is relevant to those charges. The Government has provided no information whatsoever with respect to Health Integrity's algorithm, how it operates, what factors the algorithm considers, or how those factors are relevant to the Government's case or to the elements of the charges against Kraynak. Notably, the Government does not offer any explicit defense of this evidence or explain how it is intrinsic or relevant to the charges.[57] Accordingly, the Court will conditionally grant Kraynak's motion *in limine* as to this evidence, but may reconsider this ruling at trial should the Government offer a more thorough explanation of the algorithm and better connect this evidence to the charges against Kraynak.

## v.     Evidence Related to Combinations of Prescriptions

Finally, Kraynak asserts that the Government should not be permitted to reference the "nicknames given by street dealers" to certain controlled substances, as such nicknames are highly prejudicial and inflammatory.[58] Although Kraynak asserts in conclusory fashion that these nicknames are highly prejudicial, he does not explain *how* these nicknames are prejudicial. The majority of the nicknames that this

---

[57]  *See* Docs. 131, 140.

[58]  Doc. 138 at 9-10. It is not entirely clear to which nicknames Kraynak refers since there is no citation in his brief or any direct reference to those nicknames in that brief. It is possible that Kraynak is referring to the terms "Houston Cocktail" and "Holy Trinity" discussed in Anthem's investigation. Doc. 136-3 at 1. The Government believes that Kraynak is referring to the terms "pill mill" and "cocktails." Doc. 140 at 35-36.

Court has located in the record are not common parlance and are not likely to be known by the jury and, thus, likely do not carry negatives connotations with the jury. Absent some indication of prejudice, the Court cannot conclude that any unfair prejudice substantial outweighs the probative value of this evidence. Consequently, Kraynak's motion *in limine* will be conditionally denied as to his request to exclude the use of certain nicknames.

### B.      Admissibility Under Rule 404(b)

Finally, the Court concludes that, even if the above-mentioned evidence were extrinsic, it would be admissible under Rule 404(b). Federal Rule of Evidence 404(b) prohibits the introduction of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character," but permits the introduction of such evidence if it is used "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The Third Circuit has repeatedly emphasized that "Rule 404(b) is a rule of general exclusion, and carries with it no presumption of admissibility."[59] "It must be applied with careful precision, and evidence of a defendant's prior bad acts is not to be admitted unless both the proponent and the District Court plainly identify a proper, non-propensity purpose for its admission."[60] Thus,

> The proponent of Rule 404(b) evidence carries the burden to meet a four-step test: (1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified

---

[59]   *United States v. Foster*, 891 F.3d 93, 107 (3d Cir. 2018) (internal quotation marks omitted).
[60]   *Id.* (ellipsis and internal quotation marks omitted).

non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction.[61]

Here, the Government has satisfied its burden of demonstrating admissibility under Rule 404(b). First, as to evidence related to Kraynak's practice wide prescriptions, that evidence is being proffered for a non-propensity purpose. As discussed previously, evidence that demonstrates Kraynak prescribed significant quantities of controlled substances is probative of his "unlawful intent"[62] and may be offered to demonstrate that Kraynak "exceeded the legitimate bounds of medical practice" and "as evidence of a plan, design, or scheme."[63] Similarly, the evidence related to "prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose"[64] and is thus relevant to the aforementioned non-propensity purposes.[65]

Further, the probative value of that evidence is not substantially outweighed by any prejudicial effect, for many of the reasons discussed above. The evidence that

---

[61]   *Id.* at 107-08 (internal quotation marks omitted).

[62]   *Lague*, 971 F.3d at 1040.

[63]   *Merrill*, 513 F.3d at 1303.

[64]   *Lague*, 971 F.3d at 1040.

[65]   Likewise, "the proffered evidence would allow a 'jury [to] reasonably conclude that the [prior] act occurred and that the defendant was the actor.'" *Foster*, 891 F.3d at 108 (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)).

the Government seeks to introduce could reasonably indicate to the jury that, as a whole, Kraynak's prescription practices were outside the usual course of professional practice and without a legitimate medical purpose, which correspondingly reduces the chances that the prescriptions at issue in the charges here were issued within the bounds of the law. The jury further could reasonably infer that so many of Kraynak's patients would not require such large quantities of controlled substances and in such dangerous combinations, or combinations that are well known for increasing a high gained from illicit use of these substances. I note, as well, that an appropriate limiting instruction will be issued, if requested. Consequently, the relevant factors weigh in favor of admitting this evidence under Rule 404(b).

Second, with respect to evidence of administrative actions, as discussed above, that evidence demonstrates that Kraynak knew of the medical standards that are applicable to patient records and prescription practices, which is relevant to the question of whether Kraynak's actions were outside the usual course of professional practice and not for a legitimate medical purpose. It is therefore clear that the Government may introduce that evidence for a non-propensity purpose, and that the evidence is relevant to that non-propensity purpose. Although there will undoubtedly be some prejudicial impact from this evidence, the evidence is highly probative of Kraynak's knowledge of the requirements for prescribing controlled substances and, thus, of whether Kraynak was acting within the usual course of professional practice

and for a legitimate medical purpose when he issued those prescriptions, or whether he was simply engaged in a "form of drug dealing."[66] The probative value of that evidence is not substantially outweighed by its potential to cause unfair prejudice, particularly because the Court will issue an appropriate limiting instruction, if requested. Consequently, the proffered evidence, even if extrinsic to the charges, would be admissible under Rule 404(b), and Kraynak's motion *in limine* will be denied except as to any information related to the referral from Health Integrity.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that, with the exception of the referral from Health Integrity, the evidence that Kraynak seeks to exclude appears admissible. Accordingly, consistent with the above discussion, Kraynak's motion *in limine* will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[66]   Doc. 60 at 5.