IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:17-CR-00403 |
| v. | (Chief Judge Brann) |
| RAYMOND KRAYNAK, | |
| Defendant. | |

MEMORANDUM OPINION

SEPTEMBER 20, 2021

## I.  BACKGROUND

In 2017, Raymond Kraynak—a doctor of osteopathy who was registered by the Drug Enforcement Administration to prescribe Schedule II, III, IV, and V controlled substances—was indicted on twelve counts of unlawfully distributing and dispensing a controlled substance, in violation of 21 U.S.C. § 841(a)(1), five counts of unlawfully distributing and dispensing a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1), and two counts of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1).[1]

In Count Thirteen of the Indictment, Kraynak is charged with causing the death of R.C. by prescribing Alprazolam, Hydrocodone, Carisoprodol; in Count Fourteen with causing the death of D.H. by prescribing Oxycodone; in Count Fifteen with causing the death of A.K. by prescribing Oxycodone and Alprazolam; in Count

---
1   Doc. 3.

Sixteen with causing the death of M.L. by prescribing Temazepam, Alprazolam, and Hydrocodone; and in Count Seventeen with causing the death of C.S. by prescribing Oxycodone, Carisoprodol, Diazepam, and Zolpidem.[2]

In early 2020, both Kraynak and the Government exchanged notices of proposed expert testimony, with the Government stating that it intended to offer testimony from Stephen M. Thomas, M.D., and Kraynak stating that he intended to offer testimony from Carol Warfield, M.D.[3] In March 2020, Kraynak filed a motion to exclude the expert testimony of Dr. Thomas.[4] On August 5, 2020, this Court conducted a *Daubert*[5] hearing on that motion and, on November 9, 2020, the Court denied that motion.[6] More than one year after the *Daubert* hearing was conducted, Kraynak provided the Government with a notice of expert opinion related to the proposed testimony of Susan M. Skolly-Danziger, Pharm.D.,[7] which was followed by a Government motion to exclude that testimony.[8]

This Court granted the Government's motion and excluded the testimony of Dr. Skolly-Danziger.[9] In so doing, the Court first concluded that Dr. Skolly-Danziger's opinion was unreliable, as a great deal of her opinion rested on

---

[2]  *Id.* at 19.
[3]  Doc. 53.
[4]  Doc. 57.
[5]  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).
[6]  Docs. 90, 93, 94.
[7]  Doc. 165-1; *see also* Doc. 170.
[8]  Doc. 164.
[9]  Docs. 179, 180.

speculation and conjecture, with Dr. Skolly-Danziger being unable to offer any definitive opinion about whether the decedents' blood tests were corrupted in any manner.[10] Second, the Court determined that Dr. Skolly-Danziger's opinion in some respects did not fit the case, as she improperly focused on the conduct of the decedents, rather than Kraynak's conduct, and focused on information and conclusions that are not relevant to the case.[11] Finally, the Court concluded that, regardless of the admissibility of Dr. Skolly-Danziger's opinion under *Daubert*, her opinion would be inadmissible under Federal Rule of Evidence 403 because any minimal probative value offered by the opinion is substantially outweighed by its likelihood to confuse the issues and mislead the jury.[12]

Kraynak has now filed a motion for reconsideration of the Order excluding Dr. Skolly-Danziger's opinion, arguing that reconsideration is warranted for two reasons.[13] First, he asserts that the Court committed a clear error of law when it determined that Dr. Skolly-Danziger's opinions should be excluded under *Daubert*, as (1) her opinions are not "junk science," (2) the Court improperly focused on the reliability of her conclusions, rather than the reliability of her methodology, and (3) her opinions fit this case because they cast doubt on the Government's contention that the drugs prescribed by Kraynak were the but-for causes of the decedents'

---

[10]   Doc. 179 at 16-24.
[11]   *Id.* at 25-28.
[12]   *Id.* at 28-31.
[13]   Doc. 181.

deaths.[14] Second, Kraynak contends that reconsideration is warranted to prevent manifest injustice, since the exclusion of Dr. Skolly-Danziger's opinions would prevent Kraynak from mounting a defense, in violation of his Fifth, Sixth, and Fourteenth Amendment rights.[15]

The Government opposes the motion and asserts that there was no clear error of law in the Court's ruling, as Dr. Skolly-Danziger's opinions were speculative, self-contradictory, exceeded the scope of her expertise, and did not offer any opinion as to the most likely causes of death for the decedents.[16] Moreover, the Government contends that the Court correctly determined that Dr. Skolly-Danziger's opinions did not fit the case, as the decedents' behavior is not relevant in this case.[17] Finally, the Government argues that there is no manifest injustice, as Kraynak's right to present a defense does not grant him the right to present an expert opinion that is founded on speculation, will obscure the relevant issues at trial, and will confuse the jury.[18] Kraynak has filed a reply brief,[19] and this matter is now ripe for disposition. For the following reasons, the motion for reconsideration will be denied.

---

[14] Doc. 182 at 2-4.
[15] *Id.* at 4-6.
[16] Doc. 194 at 3-7.
[17] *Id.* at 7-8.
[18] *Id.* at 8-9.
[19] Doc. 200.

## II.     DISCUSSION

To properly support a motion for reconsideration, a party must demonstrate "at least one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."[20] As to the third ground, in reviewing for clear error, reconsideration is warranted only if the "[C]ourt is left with the definite and firm conviction that a mistake has been committed."[21] "Thus, [to warrant reconsideration, the movant] must show more than mere disagreement with the earlier ruling; [he] must show that the . . . Court committed a direct, obvious, or observable error, and one that is of at least some importance to the larger proceedings."[22] Kraynak does not argue that there has been an intervening change of controlling law or newly discovered evidence, but instead asserts that the Court committed clear errors of law in excluding Dr. Skolly-Danziger's opinion, and that such exclusion will result in manifest injustice.[23]

---

[20] *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 87 (3d Cir. 2017) (ellipsis and internal quotation marks omitted).
[21] *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258 (3d Cir. 2008) (internal quotation marks omitted).
[22] *In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018) (brackets, quotation marks, and citation omitted).
[23] *See* Docs. 182, 200.

### A.  Whether the Court Committed a Clear Error of Law

Kraynak primarily argues that the Court committed a clear error of law when it concluded that Dr. Skolly-Danziger's opinions should be excluded under *Daubert*, as her opinions are reliable, relevant, and fit the case.[24]

#### 1.  Reliability of Dr. Skolly-Danziger's Opinion

First, Kraynak argues that the Court committed a clear error of law in concluding that Dr. Skolly-Danziger's opinion was in some respects unreliable.[25] The Court disagrees and rejects Kraynak's assertion that Dr. Skolly-Danziger should be permitted to offer opinions that attack the Government's theory regarding causes of death, and that any issues with the strength of her opinion should be left for the jury to evaluate.[26]

As the Court noted in addressing Kraynak's earlier motion to exclude the Government's expert witness:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.[27]

Here, as discussed in the Court's Memorandum Opinion granting the Government's motion to exclude Dr. Skolly-Danziger's opinion, Dr. Skolly-

---

[24] Doc. 182 at 2-4.
[25] Doc. 182 at 3-4.
[26] *Id.* at 3.
[27] Doc. 93 at 17 (quoting *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005)).

Danziger's opinion is based heavily on speculation and conjecture, such that it cannot be of assistance to the jury and must be excluded. For example, as to any purported deficiencies in the collection of R.C.'s blood, Dr. Skolly-Danziger candidly admitted that it is "unknown" whether there were actually any issues with that sample or the resulting blood tests.[28] Dr. Skolly-Danziger was not able to opine that any issues actually occurred with this or any of the other relevant blood samples that would have impacted the accuracy of tests conducted on those samples.[29]

Similarly, Dr. Skolly-Danziger testified that D.H.'s blood sample was "likely" contaminated by gastric contents, despite opining that the only way to confirm whether contamination occurred was to test the blood sample against femoral blood, which did not happen.[30] Despite opining that gastric contamination was likely, Dr. Skolly-Danziger was unable to provide any basis for her conclusion. While it may be true that contamination *might* occur, there was no testimony that it is *likely* to occur, and Dr. Skolly-Danziger provided no explanation as to how she could

---

[28] Doc. 179 at 17.
[29] Nor was Dr. Skolly-Danziger able to opine as to what most likely happened with blood samples, or whether it was more likely than not that the sample were contaminated. Kraynak argues that "the central point of [Dr. Skolly-Danziger's] testimony was that the absence of the critical components of any cause of death investigation—autopsies and adherence to standard blood collection, storage, and preservation procedures, undermined the government's causation theory." Doc. 200 at 1-2. However, as discussed at length previously, Dr. Skolly-Danziger never offered an admissible opinion related to whether any of those issues actually impacted the test results or undermined the opinion of the Government's expert witness. It would be of no use to the jury if Dr. Skolly-Danziger were to point out potential issues with blood collection, but then acknowledge that it is entirely unknown whether those issues actually arose in this case. There must be *some* evidence supporting a conclusion that the blood samples here were actually compromised.
[30] *Id.* at 19-20.

determine with any certainty that D.H.'s blood test was inaccurate. The Court was concerned with the absence of any firm explanation from Dr. Skolly-Danziger as to how she determined that contamination was likely and, thus, asked her a pointed follow-up question on that matter; Dr. Skolly-Danziger was again unable to provide a sufficient answer as to how she concluded that contamination from gastric contents was likely, and opined only that it was "possible."[31] Her testimony thus essentially amounted to a statement that because it is possible that gastric contamination occurred, contamination likely occurred, which amounts to little more than *ipse dixit*.

With respect to M.L., Dr. Skolly-Danziger testified that the absence of acetaminophen in the blood sample was suspicious because M.L. was prescribed Vicodin, which is a combination of hydrocodone and acetaminophen.[32] Despite finding this suspicious, Dr. Skolly-Danziger acknowledged that the absence of acetaminophen may simply be a result of the fact that the blood was not tested for acetaminophen.[33] Dr. Skolly-Danziger's suspicion therefore again amounts to nothing more than speculation. As the Supreme Court has made clear, an expert opinion may not rest upon "subjective belief or unsupported speculation"[34] and, accordingly, much of Dr. Skolly-Danziger's opinion must be excluded, as set forth in the Court's Memorandum Opinion granting the Government's motion to exclude.

---

[31] Doc. 174 at 64; *see id.* at 63-65.
[32] Doc. 179 at 23-24.
[33] *Id.*
[34] *Daubert*, 509 U.S. at 590.

Kraynak nevertheless asserts, based on two Third Circuit cases, that Dr. Skolly-Danziger's opinion should be admitted because it counters the Government's theory of causation.[35] Those cases are, however, inapposite. For example, Kraynak cites to *Holbrook v. Lykes Brothers Steamship Company, Inc.*,[36] for the proposition that experts should be permitted to testify as to the most likely cause of some event, particularly when the expert is proffered to counter the Government's theory of causation.[37]

In *Holbrook*, the Third Circuit held that expert testimony was admissible despite the fact that it "would have been insufficient to prove that radiation exposure caused the cancer," because the party that proffered the expert testimony did not bear the burden of proof, while the testimony "was sufficiently certain and could help the jury to evaluate testimony by plaintiff's experts that asbestos exposure caused the cancer, an issue on which plaintiff bore the burden of proof."[38] However, the Third Circuit also emphasized that expert opinions may be excluded in "[s]ituations in which . . . the expert testimony is speculative, using such language as 'possibility.'"[39] In that vein, when an expert qualifies her opinion with terms that indicate a lack of certainty, such qualifiers

---

[35] Doc. 182 at 4.
[36] 80 F.3d 777 (3d Cir. 1996).
[37] Doc. 182 at 4.
[38] *Holbrook*, 80 F.3d at 786.
[39] *Id.* at 785 (internal quotation marks omitted).

may indicate the level of confidence the expert has in the expressed opinion. Perhaps nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision.[40]

Dr. Skolly-Danziger's opinion far more closely resembles the latter situation rather than the former. As described in this Court's Memorandum Opinion granting the Government's motion, Dr. Skolly-Danziger's opinion was based primarily on speculation and supposition, and was replete with qualifiers such as "unknown," "suspicion," "may," and "possible."[41] Although Dr. Skolly-Danziger testified within a reasonable degree of certainty that blood collection procedures may impact blood samples, she was able to offer only speculation as to whether there were any actual issues with the blood samples at issue here. Because she "cannot form an opinion with sufficient certainty so as to make a medical judgment [about whether the blood samples were contaminated in any way], neither can a jury use that information to reach a decision."[42]

Kraynak next cites to *Heller v. Shaw Industries, Inc.*,[43] to argue that "[e]xperts commonly testify about the 'most likely' cause of some event, and it is permissible for them to do so [as] long as that opinion rests on 'good grounds.'"[44] In *Heller*, the Third Circuit considered whether a district court properly excluded expert testimony

---

[40] *Id.*
[41] Doc. 174 at 64; Doc. 179 at 17-24.
[42] *Holbrook*, 80 F.3d at 785.
[43] 167 F.3d 146 (3d Cir. 1999).
[44] Doc. 182 at 4.

simply because the expert cited to no research in support of his opinion.[45] The Third Circuit rejected the notion that studies were required to support an expert's opinion, and held that if the expert "conducted a thorough differential diagnosis . . . and had thereby ruled out other possible causes of [an] illness, and assuming that [the expert] had relied on a valid and strong temporal relationship between" an event and subsequent health problems, the opinion was admissible.[46] This is so because a "differential diagnosis consists of a testable hypothesis, has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context."[47]

But here, Dr. Skolly-Danziger does not appear to have conducted any form of a differential diagnosis. She did not affirmatively rule out any alternatives in reaching her conclusions; at most, she listed possible alternatives to her theories, but failed to exclude those alternate theories—or apparently rejected them without explanation.[48] Dr. Skolly-Danziger simply concluded, without explanation, that her conclusion was likely the correct explanation. Because Dr. Skolly-Danziger did not

---

[45] *Heller*, 167 F.3d at 154.
[46] *Id.*
[47] *Id.* at 154-55.
[48] For example, with respect to M.L., Dr. Skolly-Danziger found the absence of acetaminophen suspicious and listed three possible reasons why acetaminophen may not have been found in the blood test, but failed to explain why any of those possibilities would be more or less likely and why, in light of some of the innocuous explanations for the absence of acetaminophen, its absence is actually suspicious. Doc. 170 at 21.

undertake a proper differential diagnosis or any other legitimate, testable process in reaching her conclusion, *Heller* too is not applicable here.

### 2. Fit of Dr. Skolly-Danziger's Opinion

Next, the Court concludes that it did not clearly err in determining that many of Dr. Skolly-Danziger's opinions do not fit this case, as those opinions are largely irrelevant. As the Court noted previously, some of Dr. Skolly-Danziger's opinions improperly focused on the conduct of the patients in taking prescription medication—which is not relevant here—rather than Kraynak's conduct in issuing prescriptions—which is relevant here.[49]

Furthermore, as explained previously, Dr. Skolly-Danziger's opinion that C.S. was a rapid metabolizer is irrelevant to whether the substances that Kraynak prescribed were prescribed for a legitimate medical purpose, and whether those substances caused C.S.'s death.[50] The Court further noted that Dr. Skolly-Danziger's opinions related to the failure to find acetaminophen in R.C.'s blood sample and "[w]hether the hydrocodone levels in C.S.'s blood were increased by the presence of Benadryl" had "no impact on the question of whether Kraynak issued the . . . prescription[s] in the usual course of professional practice and for a legitimate

---

[49] Doc. 179 at 25-26.
[50] *Id.* at 27.

medical purpose, or whether [those prescriptions] actually caused [the decedents'] death[s]."[51] Kraynak points to nothing that would undermine these conclusions.

Kraynak nevertheless asserts that this Court erred for three reasons in concluding that Dr. Skolly-Danziger's opinion regarding patient conduct is irrelevant. First, he argues—in conclusory fashion—that *United States v. Tighe*,[52] the decision upon which this Court relied in concluding that only a physician's conduct in issuing a prescription is relevant, has been superseded by the Anti-Drug Abuse Act of 1986[53] and *Apprendi v. New Jersey*.[54] Contrary to Kraynak's argument, those decisions did nothing to alter the law as explained in *Tighe*.

That neither *Apprendi* nor the Controlled Substances Act undermined the Third Circuit's opinion in *Tighe* is demonstrated by recent opinions from both the Third Circuit and other circuit courts. For example, in *United States v. Maynard*, an unpublished decision, the Third Circuit reiterated *Tighe*'s conclusion that "by placing a prescription for a controlled substance, issued outside of the usual course of medical practice, in the hands of an ultimate user a physician completes the

---

[51] *Id.* at 28. Kraynak argues that "[t]his Court and the government maintain that relevancy here is cabined by whether [Dr.] Kraynak prescribed the drugs for a legitimate medical purpose within the usual course of professional practice" while ignoring the relevance of whether those drugs caused the decedents' deaths. Doc. 200 at 2 (brackets and internal quotation marks omitted). This is blatantly inaccurate. As the above-quoted language makes clear, the Court twice explicitly stated that Dr. Skolly-Danziger's opinion was not relevant to "the two relevant issues here: whether Kraynak prescribed substances in the usual course of professional practice and for a legitimate medical purpose, *and whether those prescribed substances were the but-for cause of [the decedents'] death[es]*." Doc. 179 at 27 (emphasis added).
[52] 551 F.2d 18 (3d Cir. 1977).
[53] Pub. L. No. 99-570, 100 Stat. 3207.
[54] 530 U.S. 466 (2000).

offense of dispensing under 21 U.S.C. § 841(a)(1)."[55] And the United States Court of Appeals for the Eleventh Circuit in 2015 discussed its prior decisions, and decisions of other courts of appeals—including the Third Circuit's decision in *Tighe*—when it held that "[w]hen a physician writes a patient a prescription for a controlled substance, the physician is constructively transferring the controlled substance to the patient, thereby accomplishing the delivery required for dispensation under [21 U.S.C.] § 802(10)."[56]

Moreover, in *Burrage v. United States*, the United States Supreme Court held that the Government, in prosecuting an individual for distribution of a controlled substance resulting in death, must prove beyond a reasonable doubt that a decedent's use of "the drug distributed by the defendant . . . is a but-for cause of the death."[57] Notably absent from this holding is any consideration of the decedent's conduct—other than the requirement that the decedent must have used the substance provided by the defendant. This serves to emphasize that it is irrelevant whether a decedent used more drugs than is advisable. Were such information relevant, any physician could escape criminal liability for an individual's death by merely including proper instructions for use when prescribing a controlled substance, even while prescribing massive quantities of such substances outside the usual course of professional practice and without a legitimate medical purpose, and even if the physician ignores

---

[55] *United States v. Maynard*, 278 F. App'x 214, 218 (3d Cir. 2008).
[56] *United States v. Azmat*, 805 F.3d 1018, 1034 (11th Cir. 2015).
[57] 571 U.S. 204, 218–19 (2014).

obvious signs that the patient is abusing the medications. Plainly this is not what Congress intended.

Second, Kraynak notes that the Government's own expert witness "places the cause of the deaths at issue" and queries "[w]hy then is Dr. Kraynak precluded, on relevancy grounds, from offering expert testimony in response?"[58] The answer, as related previously, is simple: Dr. Skolly-Danziger's opinions in several respects address issues that are not legally relevant to the cause of death. It is not relevant whether the decedents abused their prescription narcotics, were rapid metabolizers, or that levels of hydrocodone present in the decedents' blood was increased by the use of Benadryl. All that is relevant here is whether (1) Kraynak prescribed controlled substances to the decedents outside the usual course of professional practice and without a legitimate medical purpose, and (2) the drugs that Kraynak prescribed caused the deaths of the identified decedents.

Third, Kraynak argues that the Government "has opened the door to causation and the post-prescription conduct of the decedents" by presenting testimony from some of Kraynak's former patients, all of whom discussed their prior abuse of prescription medications.[59] This argument is misdirected and without merit. Certainly, by discussing those witnesses' abuse of the medications prescribed by

---

[58] Doc. 200 at 4.
[59] *Id.*

Kraynak, the Government opened the door for the defense to explore those issues on cross-examination.

That does not, however, grant Kraynak carte blanche to delve into irrelevant expert testimony about patient conduct and attempt to deflect blame onto the patients for abusing the prescriptions that Kraynak issued. Again, the patients' post-prescription conduct is wholly irrelevant to the crimes charged. As discussed previously, under 21 U.S.C. § 841(b)(1)(C) the Government need only prove that the controlled substances prescribed by Kraynak caused the decedents' deaths; it does not—as the defense seems to believe—need to prove that Kraynak directly caused the decedents' deaths by knowingly prescribing controlled substances with knowledge that the patients would consume lethal doses of those drugs.[60] In short, the Government has not opened the door for Kraynak to present irrelevant and misleading expert testimony regarding patient conduct, and reconsideration is not warranted based upon the testimony presented thus far at trial.

### B. Whether a Manifest Injustice Would Result from Exclusion

Finally, Kraynak asserts that reconsideration is warranted because the exclusion of Dr. Skolly-Danziger's opinion would result in a manifest injustice by

---

[60] Again, were Kraynak's theory of causation adopted, a doctor could escape any liability for his prescription practices by simply including proper instructions for the use of the drugs with the prescription and then burying his head in the sand and ignoring clear signs of abuse by his patients. This would render 21 U.S.C. § 841(b)(1)(C) inapplicable to physicians in all but the rarest of circumstances.

inhibiting Kraynak's constitutional right to present a defense.[61] It is true, as Kraynak notes, that the United States Supreme Court in *Holmes v. South Carolina*[62] held that, where an evidentiary rule serves no "legitimate end," the application of that rule "violates a criminal defendant's right to have a meaningful opportunity to present a complete defense."[63]

In *Holmes*, the Supreme Court evaluated a South Carolina Supreme Court evidentiary rule that prevented a defendant from presenting evidence of a third party's guilty if there was "strong evidence" of the defendant's guilt.[64] Under that rule, there was no "focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt," nor did the rule call for any "examination of the credibility of the prosecution's witnesses or the reliability of its evidence."[65] Thus, the evidentiary rule failed to "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues" and failed to serve "any other legitimate end."[66]

That is clearly not the case here. Dr. Skolly-Danziger's opinion has been excluded because it is based on speculation, is irrelevant, does not fit this case, and because any probative value is substantially outweighed by its likelihood to confuse

---

[61] Doc. 182 at 4-6.
[62] 547 U.S. 319 (2006).
[63] *Id.* at 331 (internal quotation marks omitted).
[64] *Id.* at 329.
[65] *Id.*
[66] *Id.* at 330, 331.

the issues and mislead the jury.[67] Excluding Dr. Skolly-Danziger's opinion based upon well-established Supreme Court precedent and Federal Rules of Evidence that are specifically geared toward evaluating the "probative value or the potential adverse effects of admitting the" challenged evidence does not offend the Constitution.

Certainly, Kraynak has a due process right to present a defense. That right is not, however, unfettered, and must yield in certain circumstances to other important considerations, such as those implicated by the Supreme Court's ruling in *Daubert*. Kraynak may not defeat evidentiary rules simply by waving the talismanic flag of due process, and Kraynak's argument, if adopted, would eviscerate well-established rules of evidence such as the necessity of relevance, or the requirement that parties not perjure themselves and attorneys not suborn perjury. Accordingly, excluding Dr. Skolly-Danziger's opinion does not violated Kraynak's constitutional rights, and reconsideration of the Court's decision to exclude her opinion is not warranted.

---

[67]   Doc. 179 at 28-31.

## III. CONCLUSION

The Court concludes that Kraynak has not proffered a sufficient reason for the Court to reconsider its September 3, 2021 Memorandum Opinion and Order. Consequently, the Court will deny Kraynak's motion for reconsideration.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge